1  BUCHALTER NEMER
   A Professional Corporation
2  PETER D. HOLBROOK (SBN: 105845)
   CAROL DWYER DEFREITAS (SBN: 239769)
3  18400 Von Karman Avenue, Suite 800
   Irvine, CA 92612-0514
4  Telephone: (949) 760-1121
   Facsimile: (949) 720-0182
5  Email: pholbrook@buchalter.com
   Email: cdefreitas@buchalter.com
6

7  Attorneys for Plaintiff
   OCEAN TOMO, LLC, an Illinois Limited Liability
8  Company

9                  UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11

12
   OCEAN TOMO, LLC, an Illinois        Case No.    SACV12-146 JVS(MLGx)
13 Limited Liability Company,
                                       COMPLAINT FOR DAMAGES AND
14           Plaintiff,                 PERMANENT INJUNCTION:

15      vs.                            1. MISAPPROPRIATION OF
                                       TRADE SECRETS;
16 STEVE LEE, an individual
                                       2. BREACH OF CONTRACT;
17           Defendant.
                                       3. VIOLATION OF PENAL CODE
18                                     §502;

19                                     4. UNFAIR COMPETITION;

20                                     5. VIOLATION OF COMPUTER
                                       FRAUD ABUSE ACT, 18 USC § 1030
21

22

23

24         Plaintiff, OCEAN TOMO, LLC ("Ocean Tomo"), complains and alleges as
25 follows:
26

27

28

BN 10904090v1                          1

# INTRODUCTION

1.      Ocean Tomo alleges herein causes of action for Breach of Contract, Misappropriation of Trade Secrets, Violation of Penal Code § 502, Violation of Business and Professions Code § 17200, and Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a).  Ocean Tomo seeks damages and injunctive relief against Defendant Steve Lee ("Lee") and any other person, firm, entity or corporation acting in concert with or controlled by him from using, disclosing and otherwise misappropriating Ocean Tomo's trade secrets and confidential information.

2.      Lee is a former Managing Director of Ocean Tomo.  As an executive of Ocean Tomo, Lee was granted clearance and access to highly-sensitive and confidential information belonging to Ocean Tomo that was not available to the general public.  Confidential information that Lee had special access to includes, but is not limited to, information related to proprietary products, programs and services, software, analyses, tests, business plans and strategies, personnel data, client lists, legal strategies and contracts, among other information.

3.      Lee resigned from Ocean Tomo on September 16, 2011 and was contractually required to immediately account for and return all company laptops, equipment, records, documents, data, and anything containing company information.  Despite numerous demands from Ocean Tomo, Lee did not return any such information to Ocean Tomo.

4.      Lee finally returned the company laptop ("Laptop") to Ocean Tomo in about November 2011.  Ocean Tomo immediately hired a third party computer forensic examiner in November 2011 to analyze the Laptop.

5.      The examiner determined that over 10 gigabytes of data were copied from the Laptop onto two external thumb drives in October 2011, after Lee's resignation and before the Laptop was returned.  The analyst further found that the

Laptop had been wiped clean of all data and re-formatted such that the hard drive would not operate.  Accordingly, the Laptop was returned to Ocean Tomo without any retrievable data.

6.      Ocean Tomo is informed and believes that Lee is using Ocean Tomo's confidential information and trade secrets for his own benefit and disclosing the confidential information and trade secrets to third parties, causing injury and irreparable harm to Ocean Tomo.

7.      Ocean Tomo is further informed and believes that Lee is disclosing or intends to disclose attorney-client privileged information and attorney work-product to third parties obtained during his employment in connection with an ongoing arbitration proceeding, which causes ongoing irreparable injury to Ocean Tomo.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiff's state and common law claims pursuant to 28 U.S.C. § 1367. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this action is between citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest or costs.

9.      Venue is proper in this district pursuant to 28 U.S.C § 1391(a) in that the defendant is subject to personal jurisdiction in this district at the time the action is commenced.  Venue is also proper in this district because a substantial part of the events giving rise to this action occurred in this judicial district.

10.     Ocean Tomo and Lee further contractually agreed and consented to venue in any court located in Orange County, California.

11.     Plaintiff, Ocean Tomo, is, and at all times herein mentioned was, a limited liability company duly organized and existing under the laws of the state of Illinois, with its principal place of business in the state of Illinois.

12.　Ocean Tomo is informed and believes and based thereon alleges that Defendant Lee is, and at all times relevant was, an individual domiciled and residing in the State of California.

## THE PARTIES

13.　Ocean Tomo is, and at all times alleged herein, a leading provider of, among other things, investment advice, risk management, transaction assistance, expert testimony, and valuation services related to intellectual property assets. Ocean Tomo is known within the industry as the "Intellectual Capital Merchant Banc firm."

14.　Among the various service offerings of Ocean Tomo is the advanced research tool known as Ocean Tomo PatentRatings. Among other things, Ocean Tomo PatentRatings is a web-based platform that assesses patent quality, relative value, competition, to provide strategic insight and analysis of a client's patent portfolio. Ocean Tomo has the exclusive license from PatentRatings, LLC ("PR LLC")to market and sell PatentRatings analysis and is a 25 percent owner of PR LLC.

15.　Ocean Tomo created a business unit devoted to the sale and marketing of Ocean Tomo PatentRatings – OTPR. Lee was hired as a Managing Director charged with responsibility for OTPR.

16.　Ocean Tomo also hired, Jonathan Barney ("Barney") as a Managing Director charged with responsibility for OTPR. Barney resigned from Ocean Tomo in February, 2011 and currently acts as chief executive of PR LLC, which, on information and belief is an actual or potential competitor of Ocean Tomo. Barney is an inventor of the PatentRatings system.

17.　Due to its vast research and development initiatives, and cultivation of long-standing business relationships, Ocean Tomo has developed certain trade secrets and confidential information pertaining to its business, including, but not

limited to:  valuation report templates, research tools, financial information, collections, revenues, profit margins, business plans, business development efforts, proprietary products, client requirements, business plans and strategies, pricing, fees, profitability factors, marketing materials, training materials, marketing strategies, personnel information, including personnel lists, resumes, salary information, organizational structure and performance evaluations.  These trade secrets and confidential information provide a substantial economic and competitive advantage to Ocean Tomo and, if known to a competitor, would negatively impact Ocean Tomo in the marketplace.

## THE EMPLOYMENT AGREEMENT AND COMPUTER ASSET AGREEMENT

18.     Lee and Ocean Tomo entered into an Employment Agreement dated July 1, 2009, which is attached hereto as Exhibit "1" and incorporated as though fully set forth herein.

19.     Pursuant to the Employment Agreement and as Managing Director for OTPR, Lee was required to oversee aspects of the day-to-day operations of OTPR and devote his best efforts and full business time and attention to the performance of his duties.  Lee was also intimately involved in discussions with certain strategic partners regarding expansion of the business to Europe and Asia.  Lee's initial starting salary was $200,000 per year pursuant to the Employment Agreement. .

20.     The Employment Agreement provides, in relevant part that Lee shall not disclose Confidential Information:

> Section 5.1.  Confidential Information.  The Executive understands and acknowledges that during his employment with the Company he will be exposed to Confidential Information that is proprietary and that rightfully belongs to the Company.  The Executive agrees that he will not use or cause to be used for his own benefit, directly or indirectly, or disclose any of such Confidential Information at any time, either during or after his employment, with the Company, whether or not such Confidential Information is developed by the

1    Executive…

2    21.    In addition, the Employment Agreement states that Lee is required to

3    protect and safeguard the Confidential Information and return all Confidential

4    Information immediately upon the termination of his employment as follows:

5    Section 5.1. Confidential Information. …

6    The Executive shall take all commercially reasonable
     steps to safeguard Confidential Information against
7    disclosure, misuse, loss or theft … Upon termination of
     Executive's employment with the Company, Executive
8    shall immediately account for and return all copies and
     embodiments, in whatever form, of the Company's
9    Confidential Information and property, including but not
     limited to written records, notes, photographs, manuals,
10   notebooks, reports, documentation, flow charts, all
     magnetic media such as tapes, disks or diskettes, patterns,
11   drawings, models, blueprints, specifications, literature,
     files and other information wherever located.

12   22.    The Employment Agreement defines Confidential Information as

13   follows:

14   Section 5.1. Confidential Information. …

15

16   … The term "Confidential Information" means any
     information not generally available to the public that was
17   obtained from the Company, or any of its Affiliates or
     that was learned as a result of the performance of any
18   services by the Executive to or on behalf of the Company,
     and which fails within the following general categories:
19   (a) information concerning trade secrets of the Company
     or any of its Affiliates; (b) information concerning
20   existing or contemplated products, services, technology,
     designs, processes, research or product developments of
21   the Company or any of its Affiliates; (c) information
     concerning business plans, sales or marketing methods,
22   methods of doing business, customer lists, customer
     usages and or requirements, or supplier information of the
23   Company or any of its Affiliates; (d) information
     concerning the identity needs, purchase and payment
24   patterns of, and credit terms, pricing of special relations
     with, the customers of the Company or any of its
25   Affiliates; (e) information concerning the identity, net
     prices and credit terms of, and special relations with, the
26   suppliers of the Company or any of its Affiliates; or (f)
     any other confidential information with the Company or
27   any of its Affiliates may reasonably have the right to
     protect by patent, copyright or by keeping it secret and
28   confidential

23.    The Employment Agreement further provides narrow exceptions to disclosure of such information, including but not limited to, if compelled by subpoena and if he has given Ocean Tomo no less than 10 business days' notice of his intent to disclose any Confidential Information.

24.    As part of Lee's employment, Ocean Tomo issued him a Laptop and hard drive, which contained Ocean Tomo's Confidential Information and trade secrets.

25.    Lee executed a Computer Asset Policy Agreement, pursuant to which he agreed not to destroy, modify or otherwise alter company hardware or software, including the Laptop.  (Exhibit "2").

**COPYING AND DESTRUCTION OF CONFIDENTIAL INFORMATION**

26.    Lee's position as Managing Director was one of high trust and confidence.  As a Managing Director of Ocean Tomo, Lee had clearance and access to highly-sensitive confidential business information and trade secrets that are not available to the public, including , financial information, collections, revenues, profit margins, business plans, business development efforts business plans and strategies, personnel data, client lists and contracts, among other information.  Lee further had access to proprietary information related to Ocean Tomo's products and services secrets that are not available to the public, including but not limited to valuation report templates, research tools, proprietary products, client requirements, client contracts, specifications and communications, among other information.  If such information was known to a competitor, would subject Ocean Tomo to irreparable injury.

27.    Ocean Tomo required its employees and executives, including Lee, to sign written agreements wherein employees agree that specified information is confidential, proprietary and trade secret information and that such information may only be used in connection with his or her employment with Ocean Tomo and not

be disclosed to third parties.

28.     Ocean Tomo restricts access to its Confidential Information to certain key individuals and only on a need-to-know basis.  For example, Ocean Tomo's financial information and strategic business plans are only distributed to Ocean Tomo's Managing Directors.  Customer-related confidential information is only provided to employees who work with that particular customer.

29.     In addition, the Employment Agreement required Lee to immediately account for and return all company information, equipment and items containing Confidential Information.  Despite numerous demands from Ocean Tomo, Lee refused to return any such Confidential Information.

30.     Lee was not authorized to retain the Laptop or otherwise access any Confidential Information following his resignation in September 2011.

31.     Instead, in October 2011, after his resignation, Lee copied over 10 gigabytes of data from the Laptop onto 2 thumb drives and then maliciously destroyed all data on the hard drive, such that no data could be retrieved.  To date, Lee has not returned or accounted for any of Confidential Information to Ocean Tomo.

## DISCLOSURE OF CONFIDENTIAL INFORMATION

32.     After 11:00 p.m. on January 24, 2012, Lee communicated to Ocean Tomo his intent to disclose Confidential Information to Barney, PR LLC and their attorneys' in connection with an arbitration proceeding initiated by Ocean Tomo against PR LLC related to PR LLC's breaches of his agreements and obligations in the licensing of PatentRatings technology and data (the "Arbitration").

33.     Lee was employed by Ocean Tomo during the course of the Arbitration proceedings, which are ongoing, and is knowledgeable of Ocean Tomo's litigation strategies, attorney-client privileged communications, and attorney work-product ("Privileged Information").  Lee had access to such

Privileged Information on his Laptop and Ocean Tomo is informed and believes that Lee copied the Privileged Information, which he intends to disclose to PR LLC and Barney.   Disclosure of any trade secrets, Confidential Information or Privileged Information to PR, LLC, Barney or any third person would cause irreparable harm to Ocean Tomo.

## IMMEDIATE INJUNCTIVE RELIEF IS NECESSARY TO PREVENT ONGOING IRREPARABLE HARM

34.     Injunctive relief is necessary to prevent the further loss of the valuable Confidential Information an unfair disclosure of the Privileged Information.  Ocean Tomo has sustained and will continue to sustain irreparable and unfair competitive injury resulting from Lee's ongoing breaches of his contractual and fiduciary obligations.

35.     Lee has demonstrated his willful and wanton disregard of his duties Ocean Tomo by destroying all proprietary and trade secret information on the hard drive.  Lee further has shown his intent to disclose Privileged Information to PR LLC and Barney in litigation against Ocean Tomo, which will cause serious irreparably injury.

36.     Ocean Tomo's Arbitration is ongoing against PR LLC.  On January 24, 2011, Lee informed Ocean Tomo that PatentRatings has asked him to provide it with information in connection with the ongoing Arbitration.  In this communication, Lee stated that he was providing Ocean Tomo with notice of his intent to communicate with PR LLC in accordance with section 5.1 of the Employment Agreement.

37.     Section 5.1 of the Employment Agreement provides that Lee will give Ocean Tomo written notice not less than 10 business days prior to disclosing Confidential Information in response to a subpoena.

38.     Accordingly, Ocean Tomo is informed and believes that in the

immediate near future, Lee will disclose Confidential Information, trade secrets, attorney-client privileged information and attorney work-product to PR LLC and Barney, unless is Lee is restrained and enjoined from doing so.

39.    In Section 5.4 of the Employment Agreement, Lee agreed that breach of the Confidentiality Provision of Section 5.1 would cause the Ocean Tomo irreparable harm, which would be impossible to measure in monetary terms and that Ocean Tomo shall be entitled to temporary and permanent injunctive relief.

## FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets—
### In Violation of California Civil Code §§ 3426, et seq.)

40.    Ocean Tomo realleges and incorporates by this reference each and every allegation set forth in Paragraphs 1 through 39 inclusive.

41.    Lee has wrongfully misappropriated for this own use and benefit trade secret and confidential proprietary information of Ocean Tomo, including but not limited to customer information, business information, technological information, attorney-client communications and attorney work product, created or developed by Ocean Tomo at substantial time and expense.

42.    Lee is in the possession of and is presently using for his sole economic benefit, the trade secrets and confidential, proprietary information of Ocean Tomo including the Confidential Information and Proprietary Information.

43.    Lee's use of this confidential, proprietary information and these trade secrets will deprive Ocean Tomo of an extremely valuable competitive advantage which was gained through substantial time and expense, and maintained in secrecy.

44.    Lee (a) misappropriated this confidential, proprietary information and these trade secrets through improper means, or (b) acquired this confidential, proprietary information and these trade secrets under circumstances which give rise to a duty on the part of Lee and other persons with access to those trade secrets to

maintain their secrecy and limited use.

45.     Lee has commenced, and is about to commence, disclosure of the confidential, proprietary information and trade secrets misappropriated from Ocean Tomo to third parties.

46.     Lee's improper use of Ocean Tomo's confidential, proprietary information and trade secrets will continue, to the irreparable injury of Ocean Tomo unless enjoined by this Court.  Ocean Tomo has no speedy or adequate remedy at law to prevent this irreparable injury absent the requested injunction.  Ocean Tomo accordingly requires an injunction in the form to be submitted to this Court prohibiting disclosure of Ocean Tomo's trade secrets and requiring a return of Ocean Tomo's Confidential Information and Proprietary Information.

47.     As a direct and proximate result of Lee's misappropriation of Ocean Tomo's confidential, proprietary information and trade secrets, Ocean Tomo has suffered damages in an amount which is presently unascertainable, plus interest in accordance with applicable law.  Ocean Tomo will seek leave of this Court to amend this Complaint to set forth the precise amount of these damages when that amount has been ascertained.

48.     Lee's conduct in obtaining and exploiting Ocean Tomo's Confidential Information and Proprietary Information was and is willful, intentional, fraudulent, malicious, and oppressive, and has been taken in clear violation of Ocean Tomo's rights in its trade secrets and proprietary information despite Lee's knowledge of those rights.  Lee's acts constitute despicable conduct.  This conduct entitles Ocean Tomo to an award of punitive and exemplary damages.

49.     Lee's misappropriation of Ocean Tomo's trade secrets has been willful and malicious and has forced Ocean Tomo to retain attorneys to protect its legal rights in its proprietary information and trade secrets.  Lee's conduct entitles Ocean Tomo to an award of its attorneys' fees incurred and expended in protecting these

rights, in an amount according to proof.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

50.    Ocean Tomo realleges and incorporates by this reference each and every allegation set forth in Paragraphs 1 through 49 inclusive

51.    Ocean Tomo and Lee entered into a valid enforceable agreement: the Employment Agreement, attached hereto as Exhibit 1.  The Employment Agreement requires, *inter alia*, that:

(a)    Lee shall take all commercially reasonable steps to safeguard Confidential Information against disclosure, misuse, loss or theft;

(b)    Upon termination of Executive's employment with the Company, Executive shall immediately account for and return all copies and embodiments, in whatever form; and

(c)    Lee shall not disclose Confidential Information except with the consent of Ocean Tomo or as required by the performance of Lee's duties during the course of employment;

52.    Ocean Tomo and Lee entered into a valid enforceable agreement: the Computer Asset Agreement, attached hereto as Exhibit 2.  The Employment Agreement requires, *inter alia*, that:

(a)    Hardware and software provided to Lee by Ocean Tomo are company property and to be used only for company-related business;

(b)    No alterations shall be made to any hardware or software;

(c)    Ocean Tomo retains ownership of all hardware and software;

(d)    Reasonable steps would be taken to protect the hardware and software from damage.

53.    By virtue of the acts described herein, Lee has breached the Employment Agreement and Computer Asset Agreement by:

(a)     Failing to return any Confidential Information to Ocean Tomo;

(b)     Destroying all data on the Laptop hard drive;

(c)     Copying Confidential Information from the Laptop;

(d)     Disclosing and/or using the Confidential Information following his resignation and outside the scope of his employment duties.

54.     Ocean Tomo has performed all obligations, conditions and covenants to be performed under the Employment Agreement and Computer Asset Agreement, except where performance is excused.

55.     As a direct and proximate result of the foregoing breaches, Ocean Tomo has suffered damages in an amount which is presently not ascertainable, plus interest in accordance with applicable law.

## THIRD CAUSE OF ACTION

### (Violation of California Penal Code § 502)

56.     Ocean Tomo realleges and incorporates by this reference each and every allegation set forth in Paragraphs 1 through 55, inclusive.

57.     California Penal Code section 502(e) provides that a civil cause of action is available against any person who commits any acts in violation of section 502(c).

58.     Ocean Tomo is informed and believes and based thereon alleges that Lee violated section 502(c) by committing the following acts:

(a)     Improperly accessing and gaining entry without authorization to Ocean Tomo's computer and network;

(b)     Knowingly accessing Ocean Tomo's computer and without permission altering, damaging, deleting, destroying and otherwise making use of data to wrongfully obtain money, property and data;

(c)     Knowingly and without permission accessing Ocean Tomo data and copied, took, deleted, and made use of data;

(d)     Knowingly and without permission provided and/or assisted in providing a means to access Ocean Tomo's computers, servers, networks and computer systems.

59.     As a direct, proximate and foreseeable result of Lee's unlawful actions, Ocean Tomo suffered and continues to suffer substantial damages including expenditures incurred in verifying Lee's conduct and losses in an amount equal to be proven at trial.

60.     As a result of the actions herein alleged, Ocean Tomo is entitled to an award of reasonable attorneys' fees pursuant to Penal Code section 502(e).

61.     Ocean Tomo is informed and believes, and on that basis alleges, that Lee has continued these unlawful acts as herein above described, and will continue these acts unless and until enjoined and restrained by an Order of this Court, as is expressly authorized by Penal Code section 502(e)(1).

62.     Ocean Tomo is informed and believes, and on that basis alleges, that the Lee's wrongful actions were taken with the intent to injure Ocean Tomo and its business.  Ocean Tomo further alleges that Lee knowingly and willfully committed the acts alleged herein in violation of Penal Code section 502(c).  Ocean Tomo is further informed and believes and based thereon alleges that said despicable acts were done maliciously, oppressively, and with a wanton disregard of Ocean Tomo's rights.  Ocean Tomo is therefore entitled to punitive damages against Defendants pursuant to Penal Code section 502(e)(4), in an amount according to proof.

## **FOURTH CAUSE OF ACTION**

### **(Unfair Competition in Violation of California Business and Professions Code §§ 17200, et seq)**

63.     Ocean Tomo realleges and incorporates by this reference each and every allegation set forth in Paragraphs 1 through 62, inclusive.

64.     Lee's acts as alleged herein, including, inter alia, misappropriating. disclosing and using Ocean Tomo's property, confidential and proprietary information, and trade secrets, constitute acts of unfair competition within the meaning of California Business and Professions Code §§ 17200, et seq. Ocean Tomo has no speedy or adequate remedy at law because Lee' acts of misappropriation have caused, and will continue to cause, irreparable injury to Ocean Tomo.

65.     Lee's taking and disclosing of Ocean Tomo's property and information and misappropriation of Ocean Tomo's confidential, proprietary information, and trade secrets are in violation of the Uniform Trade Secrets Act ("UTSA"), Civil Code §3426, et seq.

66.     Lee's taking, copying, using, and/or deleting of Ocean Tomo's property and information is in violation of Penal Code section 502.

67.     Ocean Tomo is informed and believes, and on that basis alleges, that Lee has continued these acts of unfair competition as herein above described, and will continue these acts unless and until enjoined and restrained by an Order of this Court.

68.     As a direct and proximate result of these acts of unfair competition, Ocean Tomo has suffered damage, while Lee has unjustly and inequitably profited and received ill-gotten gains at the expense of and to the detriment of Ocean Tomo in an amount which is presently unascertainable.  Lee's conduct entitles Ocean Tomo to restitution in the amount of Lee's ill-gotten gains.

69.     Lee's taking of Ocean Tomo's property and information and misappropriation and disclosure of Ocean Tomo's confidential, proprietary information and trade secrets has forced Ocean Tomo to retain attorneys to protect its legal rights in its proprietary information and trade secrets.  Lee's conduct entitles Ocean Tomo to an award of its attorneys' fees incurred and expended in

protecting these rights, in an amount according to proof.

## FIFTH CAUSE OF ACTION

### (Violation of Computer Fraud Abuse Act, 18 USC § 1030)

70.     Ocean Tomo realleges and incorporates by this reference each and every allegation set forth in Paragraphs 1 through 69, inclusive.

71.     The Laptop was used in interstate commerce and constitutes a "protected computer" under the CFAA, 18 U.S.C. § 1030(e)(2)(b).

72.     Approximately four months after Lee resigned from his employment at Ocean Tomo, Lee intentionally accessed the Laptop, without authorization, with the intent to defraud and harm Ocean Tomo, violated 18 USC §§ 1030(a)(2)(c), (a)(4), and (a)(5)(A) by:

(a)     copying over 10 gigabytes of data from the Laptop onto two thumbdrives;

(b)     destroying data on the Laptop;

(c)     overwriting data on the Laptop such that any remaining data is unreadable and unusable.

73.     Defendant knowingly and intentionally accessed, and caused the copying, deletion, overwriting and destruction of Ocean Tomo's computer without authorization, and as a result of such conduct caused damage, or recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5).

74.     As a result of defendant's conduct, Ocean Tomo has suffered damages, including impairment of the integrity and/or availability of data, programs, systems, and/or information in Ocean Tomo's computer facilities, in an amount to be determined at trial. Ocean Tomo's damages aggregate to at least $5,000 in value in the year preceding the date of the filing of this complaint.

75.     Defendant threatens to continue to engage in the unlawful actions alleged herein, and unless restrained and enjoined will continue to do so, causing

irreparable harm to Ocean Tomo. It is difficult to ascertain the amount of compensation that could afford Ocean Tomo adequate relief for defendant's continuing unlawful acts. Ocean Tomo's remedy at law is, therefore, inadequate to compensate for the injuries threatened, and Ocean Tomo is entitled to preliminary and permanent injunctive relief.

## **PRAYER**

WHEREFORE, Ocean Tomo prays for relief against Lee, as follows:

A.    For a temporary restraining order and a preliminary and permanent injunction enjoining and restraining Lee and any other person, firm, entity or corporation acting in concert with or controlled by him in whole or in part from:

1.    Accessing, disclosing, sharing, copying divulging, making known to any business or individual, or making any use whatsoever of:

(a)    The attorney-client communications, attorney work-product of Ocean Tomo; and

(b) the confidential, proprietary information, and trade secrets of Ocean Tomo relating to business information, client information, technology, products, and services of Ocean Tomo.

B.    For a temporary restraining order and preliminary and permanent injunction requiring Lee and any other person, firm, entity or corporation acting in concert with or controlled by him in whole or in part, to immediately deliver to Ocean Tomo all data, information, files taken and misappropriated from Ocean Tomo which are in their control, custody or possession;

C.    For damages in an amount which is presently unascertainable, plus interest in accordance with applicable law;

D.    For punitive and exemplary damages;

E    For recovery of all attorneys' fees and costs incurred in this action, in

1   an amount according to proof.

2       F.      For cost of suit incurred herein;

3       G.      For such other and further relief as the Court deems just and proper.

4

5   DATED: January 27, 2012          BUCHALTER NEMER
                                     A Professional Corporation
6

7                                    By: _____
8                                          PETER D. HOLBROOK
                                           CAROL DWYER DEFREITAS
9                                          Attorneys for Plaintiff
                                           OCEAN TOMO, LLC AN ILLINOIS
10                                         LIMITED LIABILITY COMPANY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**JURY DEMAND**

2      Pursuant to F.R.C.P. 38(b), Ocean Tomo, LLC hereby demands a trial by

3  jury in this action of any issues triable by jury.

4

5  DATED: January 27, 2012        BUCHALTER NEMER
                                   A Professional Corporation

6

7                                 By: _____
                                          PETER D. HOLBROOK
8                                       CAROL DWYER DEFREITAS
                                         Attorneys for Plaintiff
9                                  OCEAN TOMO, LLC AN ILLINOIS
                                   LIMITED LIABILITY COMPANY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit "1"

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT, which supersedes any previous employment agreement, dated as of July 1, 2009, is between Ocean Tomo, LLC, an Illinois limited liability company (the "Company"), and Steve S. Lee (the "Executive").

WHEREAS, the Company desires to employ the Executive as an employee of the Company (or one of its Affiliates), and the Executive desires to serve as an employee of the Company (or one of its Affiliates), on the terms and conditions set forth in the Agreement.

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

Section 1.1   <u>Certain Definitions</u>.  For purposes of this Agreement:

(a)   "Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with such Person, control meaning the power to direct the affairs of a Person by reason of voting capital stock, by contract, by family relationship or otherwise.

(b)   "Cause" means (i) commission of a felony or a crime involving moral turpitude or commission of any other act or omission involving dishonesty, breach of fiduciary duty or fraud with respect to the Company or any of its Affiliates, (ii) conduct that brings the Company or any of its Affiliates into substantial public disgrace or disrepute, (iii) gross negligence or willful misconduct with respect to the Company or any of its Affiliates, (iv) material breach of this Agreement or any other agreement to which the Company and Executive are the parties or among the parties (other than the breaches described in clause (v)), (v) any breach by Executive of the provisions of <u>Article V</u> hereof, (vi) use of illegal narcotics or abuse of alcohol, which abuse of alcohol adversely affects Executive's job performance and for which Executive fails to undertake and maintain adequate treatment within fifteen (15) days after request by the Company; provided that "Cause" under this clause (vi) shall exist if such adverse effect on Executive's job performance is not remedied within sixty (60) days after the commencement of such treatment, or (vii) failure or refusal to perform his duties in any material respect in accordance with the terms of this Agreement or failure or refusal to carry out in all material respects the lawful directives of the Board of Managers or the executive officer of the Company to whom the Executive reports; provided that "Cause" under clauses (iii), (iv) or (vii) shall exist only if Executive shall have first received written notice stating with reasonable specificity the nature of such conduct, default, failure or refusal, and has failed to remedy any such conduct, default, failure or refusal within ten (10) days thereafter.

(c)   "Designated Physician" means a licensed physician practicing in the area surrounding the Company's office where Executive is assigned, that is designated by the Company and reasonably acceptable to the Executive.

CHICAGO/#1786634.3

(d)    "Permanent Disability" means physical or mental incapacity of a nature that prevents or could reasonably be expected to prevent the Executive, in the good faith professional judgment of a Designated Physician, from performing his obligations under this Agreement for a period of 90 consecutive days or 120 days, whether or not consecutive, during any 12-month period.

(e)    "Person" means any natural person, corporation, partnership, limited liability company, trust, estate, association, governmental authority or other entity of any kind.

## ARTICLE II

## EMPLOYMENT

Section 2.1    <u>Employment</u>.    The Company hereby employs the Executive as a Managing Director, and the Executive accepts such employment and agrees to serve as an employee of the Company, on the terms and conditions set forth herein.

Section 2.2    <u>Initial Term</u>.    The term of the Executive's employment under this Agreement (the "Term") will commence on the date hereof and will end upon the termination of this Agreement as contemplated by Section 4.1(a) hereof.

Section 2.3    <u>Duties</u>.    During the Term, the Executive shall serve as Managing Director and, in such capacity and subject to the direction of the Board of Managers of the Company (the "Board"), shall (a) oversee all aspects of the day-to-day operations of Patent Ratings and (b) perform such additional or other duties and responsibilities as may from time to time be assigned to the Executive by the Board.   The Executive agrees to devote his best efforts and full business time and attention to the performance of his duties under this Agreement and to perform such duties to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner.   The Executive shall not be entitled to receive additional compensation for service performed outside of normal business hours.

Section 2.4    <u>Other Employment</u>.    While employed by the Company, the Executive shall not, directly or indirectly, render services to any other Person for which the Executive receives compensation without the prior written approval of the Company.

Section 2.5    <u>Place of Performance</u>.    The Executive shall perform his duties under this Agreement at the principal office of the Company in Irvine, California or such other place or places as shall be mutually agreed upon in writing by the Board and the Executive from time to time.   The Executive may be required to travel from time to time outside of the Irvine, California, area in the performance of his duties under this Agreement.

## ARTICLE III

## COMPENSATION AND BENEFITS

Section 3.1    <u>Salary</u>.    During the Term, the Company shall pay the Executive, for services rendered hereunder, a salary at the annual rate of **$200,000** (the "Salary").   The Salary shall be payable in equal periodic installments, not less frequently than semi-monthly, less any

2

sums that may be required to be deducted or withheld under applicable law. The Salary may be increased periodically in the Board's sole and absolute discretion as communicated to Executive from time to time.

Section 3.2   Benefits. During the Term, the Executive will be entitled to participate in all employee benefit plans now or hereafter established or maintained by the Company for its employees generally, subject to the terms of such plans.

Section 3.3   Paid Time Off. As a Managing Director, Executive will not accrue paid time off ("PTO"), but may take time off as they see fit in keeping with their professional responsibilities. Accordingly, there is no PTO accrual and Executive will not receive payment for any alleged unused PTO days upon termination of employment.

Section 3.4   Expenses. The Company shall reimburse the Executive for all reasonable expenses incurred by the Executive in the performance of his duties under this Agreement and which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

## ARTICLE IV

## TERMINATION

Section 4.1   Termination.

(a)   The Executive's employment under this Agreement shall terminate upon the earlier of (i) the voluntary termination of this Agreement by the Executive, (ii) the death or Permanent Disability of the Executive, effective as of the date of such death or the determination of such Permanent Disability, (iii) the determination of the Company to terminate Executive's employment for Cause, effective as of the date of written notice by the Company to the Executive of such determination (or such later date as may be set forth in such notice), and (iv) the determination of the Company to terminate Executive's employment other than for Cause (a "Company Elective Termination"), effective as of the date of written notice by the Company to the Executive of such determination (or such later date as may be set forth in such notice).

(b)   The Executive agrees to cooperate fully with any Designated Physician in determining whether a Permanent Disability has occurred.

Section 4.2   Consequences of Termination.

(a)   Subject to Section 4.2(b), if the Executive's employment under this Agreement is terminated for any reason, all obligations of the Company hereunder shall cease upon such termination, except (i) its obligation to pay the Salary prorated through the date of such termination, and (ii) its obligations to provide the benefits set forth in Section 3.2 above through the date of such termination and to comply with any and all state and federal laws and regulations applying to such benefits. To the extent permitted by law, upon notice to Executive, the Company may offset any amounts Executive owes it or its Affiliates against any amounts it

CHICAGO/#1786634.3

owes Executive hereunder.   Notwithstanding anything to the contrary contained in this Agreement, if Executive owns any equity in the Company or any of its Affiliates, upon the termination of Executive's employment such equity shall be disposed of in accordance with the terms of the Company's (or its Affiliate's, as the case may be) governing documents.

(b)   In addition to the compensation payable to Employee upon termination of his employment in accordance with Section 4.2(a), if the Executive's employment under this Agreement is terminated as a result of a Company Elective Termination, the Company shall pay the Executive a severance benefit in an amount equal to one week's Salary for each full year (i.e., 12 month period) that Executive was employed by the Company, at the annual rate in effect as of such termination (the "Severance Amount").  The Severance Amount shall be payable in equal installments over the number of months equal to the number of weeks as were used in determining the amount of the severance benefit described in this Section 4.2(b), when and as if such amount were paid as Salary over such period under this Agreement, less any sums that may be required to be deducted or withheld under applicable law.  Notwithstanding anything to the contrary contained herein, if Executive breaches any of the covenants contained in Article V at any time after the termination of his employment, then the Company shall not be obligated to pay any portion of the Severance Amount to Executive and Executive shall be obligated to immediately pay the Company the amount equal to the portion of the Severance Amount previously received by Executive.

(c)   The Executive acknowledges that, notwithstanding the payment of any Severance Amount, the Executive will not be an employee of the Company following any termination of the Executive's employment with the Company pursuant to Section 4.1.

## ARTICLE V

## COVENANTS AND REPRESENTATIONS

Section 5.1   Confidential Information.  The Executive understands and acknowledges that during his employment with the Company he will be exposed to Confidential Information that is proprietary and that rightfully belongs to the Company.  The Executive agrees that he will not use or cause to be used for his own benefit, directly or indirectly, or disclose any of such Confidential Information at any time, either during or after his employment with the Company, whether or not such Confidential Information is developed by the Executive, except (a) to the extent that such disclosure or use is directly related to and required by Executive's performance of his duties to the Company; (b) with the prior written consent of the Company; or (c) in response to a subpoena or similar legal process or to discovery proceedings, in each case brought or initiated by a third party concerning a matter in litigation or based upon advice of counsel that such disclosure is necessary under applicable law or regulation (and the Executive, to the extent reasonably practicable, has given the Company not less than 10 business days' prior written notice of such disclosure).   The Executive shall take all commercially reasonable steps to safeguard Confidential Information that is within his possession or control and to protect such information against disclosure, misuse, loss or theft.   The Executive's obligations under this Section 5.1 with respect to any Confidential Information shall cease when such Confidential Information becomes publicly known as a result of any authorized disclosure.  Upon termination of Executive's employment with the Company, Executive shall immediately account for and

4

return all copies and embodiments, in whatever form, of the Company's Confidential Information and property, including but not limited to written records, notes, photographs, manuals, notebooks, reports, documentation, flow charts, all magnetic media such as tapes, disks or diskettes, patterns, drawings, models, blueprints, specifications, literature, files and other information, wherever located.  If requested by the Company, Executive shall provide the Company with written confirmation that all Confidential Information and other property of the Company has been returned.  The term "Confidential Information" means any information not generally available to the public that was obtained from the Company, or any of its Affiliates or that was learned as a result of the performance of any services by the Executive to or on behalf of the Company, and which includes services, products and programs, computers, software, source code, program libraries, interface specifications, analyses, tests, notes, designs, diagrams, client lists, client contracts, compiled historic client information, sales support and end user support practices and procedures, quality assurance, business plans and strategies, tactics, methods, pricing, fees, pricing and profitability factors, marketing materials, training materials, research, marketing strategies, personnel information, including personnel lists, resumes, personnel data, salary information, organizational structure and performance evaluations, trade secrets, other confidential information concerning the business of the Company or its Affiliates, and information from or about the clients of the Company or its Affiliates that the clients of the Company or its Affiliates expressly wish, and may reasonably expect, to be kept confidential.

Section 5.2    <u>Restriction on Unfair Competition and Nonsolicitation</u>

(a)    The Executive agrees that during the Restricted Period (as hereafter defined) the Executive, except as part of his duties as an employee of the Company, will not, directly or indirectly, whether as principal, agent, officer, director, partner, employee, independent contractor, consultant, stockholder, licensor or otherwise, alone or in association with any other Person, disclose or use any Confidential Information in order to engage in, or become concerned with or interested in (directly or through its Affiliates) any business in which the Company (or any of its Affiliates) is engaged at the time of termination of the Executive's employment hereunder (a "Competing Business"); provided, however, that the Executive may invest in stocks, bonds or other securities of any business organization that is engaged, directly or indirectly, in a Competing Business (but without otherwise participating in such business) if (i) such stocks, bonds or other securities are listed on a national or regional securities exchange or have been registered under Section 12(g) of the Securities Act of 1934, as amended, and (ii) such investment in any class of such securities does not exceed one percent of the issued and outstanding shares of such class, or one percent of the aggregate principal amount of such class outstanding, as the case may be.  For purposes of this Agreement, "Restricted Period" means the period commencing on the date of this Agreement and ending on the first anniversary of the termination of the Executive's employment under this Agreement.

(b)    The Executive further covenants and agrees that during the Restricted Period he will not, directly or indirectly, whether for his own account or for the account of any other Person, disclose or use any Confidential Information in order to: (i) interfere with the relationship of the Company or any of its Affiliates with any executive, employee, client, supplier or creditor of the Company or any of its Affiliates or party with whom the Company or any of its Affiliates has a material business relationship, (ii) solicit or recruit or attempt to solicit or recruit, or hire or attempt to hire, any executive, employee or independent contractor of the

5

Company or any of its Affiliates to participate in or assist in the formation or operation of any Competing Business, (iii) discuss with any existing or potential consultant, employee, client or creditor of the Company or any of its Affiliates, or party with whom the Company or any of its Affiliates or has any material business relationship, the present or future availability of products or services provided by any Competing Business or (iv) take any action that is intended to or could reasonably be expected to divert from the Company or any of its Affiliates any business opportunity that would be within the scope of any business then conducted by the Company or any of its Affiliates.

Section 5.3    <u>Inventions and Patents</u>.

(a)    Executive agrees that all Inventions, Discoveries and Improvements shall be and are the property of the Company.  Executive agrees that he will promptly disclose, transfer and assign to the Company, without additional consideration, all Inventions, Discoveries and Improvements made, conceived expressed, developed or actually or constructively reduced to practice by the Executive solely or jointly with others during the Term, which are within or in any way related to the existing or contemplated scope of the business of the Company, all of which Inventions, Discoveries and Improvement shall be deemed to have been made within the Term if made or conceived within six months of the end of the Term.  For purposes of this provision, the terms "Inventions, Discoveries and Improvements" shall include all ideas, potential marketing and sales relationships, inventions, research, plans for products or services, marketing plans, computer software (including source code and object code), computer programs, original works of authorship, characters, know-how, trade secrets, information, data, developments, discoveries, improvements, modifications, technology, algorithms, and designs, whether or not subject to patent or copyright protection.  Notwithstanding anything herein to the contrary, no provision of this Agreement is intended to assign any of the Executive's rights in an Invention, Discovery or Improvement for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on Executive's own time, unless the invention relates to the business of the Company or to the Company's actual or demonstrably anticipated research or development, or unless the invention resulted from any work performed by the Executive for the Company.  Executive shall cooperate with the Company to protect the Company's interests in Inventions, Discoveries and Improvements.  Executive, at the Company's expense, shall execute and file any document(s) requested by the Company which relate to any Inventions, Discoveries and Improvements (including applications, powers of attorney, assignments or other instruments) which the Company deems necessary to apply for any patent, copyright or other proprietary right in any and all countries, or to convey any right, title or interest therein to any of its nominees, successors or assigns.

(b)    Executive agrees that he shall have no right, title or interest in or to any of the Company's patents, copyrights, trademarks or other rights in connection therewith ("Intellectual Property").  Executive agrees to assign to the Company any rights he may have or acquire in all Company Intellectual Property and all patents, copyrights, trademarks and other rights in connection therewith.  Executive further agrees as to all Company Intellectual Property to assist the Company in every proper way (but at the Company's expense) to obtain and from time to time enforce patents, copyrights, trademarks and other rights and protections relating to the Company Intellectual Property in any and all countries, and to that end he will execute all documents for use in applying for and obtaining such patents, copyrights, trademarks and other

6

rights and protections and enforcing the same, as the Company may desire, together with any assignments thereof to the Company or persons designated by it. Executive's obligation to assist the Company in obtaining and enforcing patents, copyrights, trademarks and other rights and protections relating to the Company Intellectual Property in any and all countries shall continue beyond the termination of his employment, but the Company shall compensate him at a reasonable rate after such termination for time actually spent by him at the Company's request on such assistance. In the event the Company is unable, after reasonable effort, to secure Executive's signature on any document or documents needed to apply for or prosecute any patent, copyright or other right or protection relating to any Company Intellectual Property, for any reason whatsoever, Executive hereby irrevocably designates and appoint the Company and its duly authorized officers and agents as his agent and attorney-in-fact to act for and on Executive's behalf to execute and file any such application or other document and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, or similar protections thereon with the same legal force and effect as if executed by Executive. Notwithstanding anything to the contrary contained in this Agreement, the provisions of this Section 3 shall not apply to any invention to which Executive is entitled under applicable law.

Section 5.4    Enforcement.

(a)    For purposes of this Article V, the term "Company" shall include any Affiliate, division, predecessor, successor or assign of the Company.

(b)    The Company and the Executive agree and declare that it is impossible to measure in monetary terms the damages that may accrue to the Company by reason of the Executive's breach of his obligations under Sections 5.1, 5.2 or 5.3 and that any breach of Sections 5.1, 5.2 or 5.3 will cause the Company irreparable injury. Therefore, if the Company shall institute an action or proceeding to enforce the provisions of any of Sections 5.1, 5.2 or 5.3, the Executive shall and hereby does, in advance, waive the claim or defense that there is an adequate remedy at law, and the Company shall be entitled to specific performance and/or temporary and permanent injunctive relief without the necessity of proving damages at law or posting a bond.

(c)    Each of the restrictive covenants contained in Sections 5.1, 5.2 and 5.3 are independent covenants.

(d)    If, at the time of enforcement of this Article V, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.

(e)    Executive acknowledges that the provisions of this Article V are in consideration of: (i) employment with the Company, and (ii) additional good and valuable consideration as set forth in this Agreement. In addition, Executive agrees and acknowledges that the restrictions contained in this Article V do not preclude Executive from earning a livelihood, nor do they unreasonably impose limitations on the Executive's ability to earn a

7

living. In addition, Executive acknowledges (A) that the business of the Company is and will be national in scope and without geographical limitation within the United States, (B) notwithstanding the state of incorporation or principal office of the Company, or any of its executives or employees (including the Executive), it is expected that the Company will have business activities and have valuable business relationships within its industry throughout the United States and (C) as part of his responsibilities, Executive may be traveling throughout the United States in furtherance of the Company's business and its relationships. In addition, Executive agrees and acknowledges that the potential harm to the Company of the non-enforcement of this Article V outweighs any potential harm to Executive of its enforcement by injunction or otherwise. Executive expressly acknowledges and agrees that (I) each and every restraint imposed by this Agreement is reasonable with respect to subject matter, time period and geographical area, and (II) nothing contained in this Article V shall eliminate, reduce or otherwise impair any obligation Executive might have to any prior employer or business relation of Executive.

Section 5.5    Executive's Representations. Executive hereby represents and warrants to the Company that (a) the execution, delivery and performance of this Agreement by Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound, (b) Executive is not a party to or bound by any employment agreement, noncompetition agreement or confidentiality agreement with any other person or entity that conflicts with this Agreement and (c) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms. Executive acknowledges that he has carefully read this Agreement and has given careful consideration to the restraints imposed upon Executive by this Agreement, has had an opportunity to consult with his counsel, and is in full agreement as to the necessity of the provisions of Article V for the reasonable and proper protection of the Company's legitimate interests.

## ARTICLE VI

## MISCELLANEOUS

Section 6.1    Waiver. None of the terms of this Agreement shall be deemed to have been waived by either party hereto, unless such waiver is in writing and signed by that party. The waiver by either party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any further breach of the provision so waived or of any other provision of this Agreement. No extension of time for the performance of any obligation or act hereunder shall be deemed an extension of time for the performance of any other obligation or act.

Section 6.2    Notices. All notices and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, mailed by certified or registered mail (postage prepaid, return receipt requested), sent prepaid by reputable overnight courier or sent by confirmed telecopier, addressed as follows:

8

(a)    if to the Executive, to 1462 Voyager Drive., Tustin, CA  92782, with a copy (which shall not constitute notice to the Executive) to Executive's attorney; and

(b)    if to the Company to Ocean Tomo, LLC, 200 W. Madison, 37th Floor, Chicago, Illinois 60606; telecopy no: (312) 327-4401, with copies (which shall not constitute notice to the Company) to Michael A. Nemeroff, Esq., Vedder Price P.C., 222 N. LaSalle Street, 26th Floor, Chicago, Illinois 60601, (312) 609-7500; telecopy no. (312) 609-5005;

or to such other address and/or such other addressee as any of the above shall have specified by notice hereunder. Each notice or other communication which shall be delivered personally, mailed or telecopied in the manner described above shall be deemed sufficiently given, served, sent, received or delivered for all purposes at such time as it is delivered to the addressee (with the return receipt, the delivery receipt or the affidavit of messenger being deemed conclusive, but not exclusive, evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

Section 6.3    Remedies.  If any party of this Agreement obtains judgment against any party hereto by reason of any breach of this Agreement or the failure of such other party to comply with the provisions hereof, a reasonable attorney's fee as fixed by the court shall be included in such judgment.  No remedy conferred upon any party to this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each such remedy shall be cumulative or shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

Section 6.4    Amendments and Modifications.  This Agreement may not be amended, modified or changed in any respect except in writing duly signed by the party against whom enforcement of such amendment, modification or change is sought.

Section 6.5    Binding Effect; Benefits.   All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, transferees, successors and permitted assigns; except that Executive may not assign his rights or obligations hereunder without the prior written consent of the Company.  Nothing in this Agreement, express or implied, is intended to or shall confer any rights, remedies, obligations or liabilities, legal or equitable, including any right of employment, on any Person other than the parties hereto and their respective successors or assigns as provided herein.

Section 6.6    Separability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be unenforceable or invalid under applicable law, such provision shall be ineffective only to the extent of such unenforceability or invalidity, and the remaining provisions of this Agreement shall continue to be binding and in full force and effect.

Section 6.7    Survival.  The provisions of Section 4.2 and Articles V and VI hereof shall continue in full force in accordance with their terms notwithstanding any termination of this Agreement or of the Executive's employment hereunder.

9

Section 6.8   Headings.  The section and other headings contained in this Agreement are for convenience only and shall not be deemed to limit, characterize or interpret any provisions of this Agreement.

Section 6.9   Entire Agreement.   This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter hereof.

Section 6.10   Governing Law.   Issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

Section 6.11   **CONSENT TO FORUM; WAIVER OF JURY TRIAL.  THE COMPANY AND EXECUTIVE AGREE THAT ALL ACTIONS TO ENFORCE THIS AGREEMENT AND ALL DISPUTES AMONG OR BETWEEN THEM ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG OR BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT, WHETHER ARISING OUT OF EMPLOYMENT TERMINATION CLAIMS OR CLAIMS BY EXECUTIVE FOR EMPLOYMENT DISCRIMINATION, HARASSMENT, RETALIATION, WRONGFUL TERMINATION, OR VIOLATIONS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AGE DISCRIMINATION IN EMPLOYMENT ACT, THE AMERICANS WITH DISABILITIES ACT, THE FAMILY AND MEDICAL LEAVE ACT, OR THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, UNDER ANY OTHER FEDERAL, STATE, FOREIGN OR LOCAL LAW, REGULATION, ORDINANCE, EXECUTIVE ORDER, CONSTITUTION OR UNDER COMMON LAW, OR OTHERWISE, SHALL BE RESOLVED ONLY BY A COURT LOCATED IN ORANGE COUNTY, CALIFORNIA OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, AND THE COMPANY AND EXECUTIVE HEREBY CONSENT AND SUBMIT TO THE JURISDICTION OF SUCH COURT. THE COMPANY AND EXECUTIVE HEREBY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THIS AGREEMENT OR EXECUTIVE'S PERFORMANCE OF THE SERVICES REFERRED TO IN THIS AGREEMENT.**

Section 6.12   Assistance in Litigation.   During and after the Term, upon reasonable notice, Executive shall furnish such information and assistance to the Company as may reasonably be required by the Company in connection with any litigation in which it or any of its Affiliates is or may become a party.

CHICAGO/#1786634.3

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer, and the Executive has executed this Agreement, all as of the day, month and year first above written.

OCEAN TOMO, LLC

By:_Mary Lou Chuinard
Its:   Director of Human Resources

**Steve S. Lee**

11

Exhibit "2"

## Computer Asset Policy Agreement

Employees should read the entire Computer Asset Policy and sign and date this form in the space provided below.  Copies of this agreement will be kept on file.

### Assets Covered By This Policy

Hardware devices and software programs provided to the employee by Ocean Tomo are to be used only for company-related business.  Hardware devices and software programs are to be used ethically, lawfully, and appropriately at all times.

### Asset Administration

No alterations, upgrades, or modifications should be made to hardware and software purchased by the organization and provided to the employee.  The organization retains ownership of all hardware and software provided to the employee.  The employee should ensure the hardware devices and software programs provided by the organization are protected from theft and physical damage using reasonable precautions.

### Email/Internet Use

Users should be aware that all information passing through or stored on company equipment can and will be monitored.

Violations of Internet and e-mail use include, but are not limited to, accessing, downloading, uploading, saving, receiving, spamming or sending material that includes sexually explicit content or other material using vulgar, sexist, racist, threatening, violent, or defamatory language. Users should not use Ocean Tomo services to disclose corporate information without prior authorization. Gambling and illegal activities are not to be conducted on company resources.

By signing below, I agree to the following terms:

- I received and read the Computer Asset Policy
- I understand and agree that any hardware equipment and software programs provided to me by the organization remains the property of the organization
- I understand I am not to modify, alter, or upgrade any hardware or software programs provided to me by the organization.
- I understand I must make reasonable efforts to protect all organization provided hardware equipment and software from theft and physical damage

Signature

Steve Lee
Employee Name

04/27/2007
Date

PatentRatings/Irvine
Department/Location